IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HILDA L. SOLIS, Secretary of Labor, U.S. Department of Labor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 09 C 4998 |
| INTERNATIONAL DETECTIVE & PROTECTIVE SERVICE, LTD., WILLIAM L. LILLARD, and ARNETT LILLARD, | ) ) ) ) | Judge Virginia M. Kendall |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Department of Labor ("Department") brought an action under the Fair Labor

Standards Act ("FLSA") to recover unpaid overtime compensation and liquidated damages against

Defendants International Detective & Protective Service, Ltd. ("IDPS"), William L. Lillard and

Arnett Lillard (collectively "Defendants"). The Department also seeks an injunction preventing

Defendants from violating the FLSA in the future. The Department moves for summary judgment

on liability and damages, or, in the alternative, partial summary judgment only on the issue of

liability. For the following reasons, the Court grants the Department's Motion for Summary

Judgment and request for an injunction.

## STATEMENT OF UNDISPUTED FACTS[1]

Local Rule 56.1 provides that "[a]ll material facts set forth in the statement required of the

moving party will be deemed admitted unless controverted by the statement of the opposing party."

---

[1] The Court will refer to the Department's 56.1 facts as "DoL ¶ __." Defendants not only failed to file a response to the Department's 56.1 facts, in which case they are deemed admitted, but also did not file their own additional facts as Local Rule 56.1 permits. *See* L.R. 56.1(b)(3)(B), (C).

L.R. 56.1(b)(3)(C). As the moving party, the Department submitted material facts supported by citations to portions of the record and affidavits, as Rule 56.1(a) requires. Defendants, however, made no Rule 56.1 submissions either disputing the Department's 56.1 statements or presenting additional material facts of their own. Under Rule 56.1, the Court deems admitted all of the Department's uncontroverted facts. L.R. 56.1(b)(3)(C).

## I. The Parties

IDPS is an Illinois corporation formerly known as International Detectives and Investigators ("IDI") that provides private security services. (DoL ¶¶ 3-5.) In 2007, 2008, and 2009 its annual volume of sales surpassed $500,000: $845, 258 in 2007; $1,025,000 in 2008; and $976,747 in 2009. (*Id.* ¶ 7.) IDPS has long-term relationships with many of its clients. (*Id.* ¶ 24.) For example, it has provided services to Limited Foods for twenty years, U.S. Equities for ten years, Walsh Construction for over five years, and Gas Plus for five years. (*Id.*)

William Lillard ("William") is the president and sole owner of IDPS. (*Id.* ¶ 8.) He is responsible for payroll, accounting, and invoicing. (*Id.*) He splits responsibility for maintaining the time records with his son, Arnett Lillard ("Arnett"). (*Id.*) William also decides pay raises, signs paychecks, and has control over all of IDPS's operations and corporate activities. (*Id.* ¶ 9.)

Arnett has been IDPS's chief operating officer for the last six years. (*Id.* ¶ 10.) He reports directly to his father, William. (*Id.*) He manages the security guards on a daily basis, and in this capacity oversees work assignments, scheduling, hiring, firing, supervision, and pay. (*Id.* ¶ 11.) He is known to the security guards as "Chief Lillard." (*Id.* ¶ 10.)

As listed in Exhibit A of the Department's Second Amended Complaint, the Department brings this action on behalf of 57 security guards ("Guards") who worked for IDPS in providing

security for IDPS's clients.  (*Id.* ¶ 12.)  The Guards were responsible for preventing and detecting intrusion and vandalism and monitoring unauthorized activity at construction sites, malls, and retail outlets.  (*Id.* ¶ 13.)

## II.    Employment Relationship

According to Defendants, the Guards were its independent contractors.  While IDI, the predecessor company to IDPS, employed its own security guards, Defendants contend that when IDI changed its corporate name to IDPS it began treating the Guards as independent contractors.  (*Id.* ¶¶ 15, 16.)  Defendants argue that they facilitated this change by asking the Guards if they wanted to become independent contractors, which resulted in the clients, not IDPS, having control over the manner in which the Guards performed their security tasks.  (*Id.* ¶¶ 17, 18.)

Upon employment, IDPS required the Guards to sign an employment contract titled "Independent Contractor Contract."  (*Id.* ¶ 20.)  The contract itself contained few material terms about the compensation amount, the time period of the contract, or the type of projects that the Guards would perform.  (*Id.* ¶ 21.)  Under the terms, it was an at-will employment relationship that either the Guards or IDPS could terminate at any time.  (*Id.*)

### A.    Guidelines for Performing Work

IDPS set the procedures for the Guards to follow in performing their security assignments.  (*Id.* ¶ 27.)  For example, at the 95th and Stony worksite, the Guards received a five-page "Policies and Procedures" handout that Melvin Rone, the Commander of the worksite, and Arnett jointly enforced.  (*Id.* ¶ 38.)  All of the Guards received a March 3, 2008 memorandum that provided them considerable guidance in performing their jobs, such as: (1) who to notify first in the event of an emergency; (2) the order of patrols, that is, the order to check fire extinguishers, exit lightings, safety

violations, and overnight parking; (3) what to include in their written reports; and (4) how to properly check their equipment. (*Id.* ¶ 29.) In addition, IDPS instructed the Guards not to personally investigate suspicious activity; instead, they were trained to call 911. (*Id.* ¶ 30.) If during a shift any incidents occurred, the Guards were required to fill out and submit to IDPS a report; these incident reports supplemented regular reports that the Guards had to provide to IDPS. (*Id.* ¶ 28.) Arnett regularly visited the worksites to verify that the Guards were complying with IDPS's rules. (*Id.* ¶ 39.)

IDPS also held meetings with the Guards to review its procedures. (*Id.* ¶ 28.) At the meetings IDPS reminded the Guards about the order of patrols and uniform code, and provided instruction on photographing accidents and checking equipment. (*Id.*)

There was an informal chain of command within IDPS, where Guards were able to rise within the ranks based on exemplary performance. (*Id.* ¶ 23.) IDPS offered title and distinctions to Guards to create incentives for them to remain with the company for the long-term. (*Id.*) For example, IDPS had officers (guards), sergeants, lieutenants, commanders, a captain, and a chief. (*Id.* ¶ 25.) In this way, IDPS was organized similar to a police organization. (*Id.*) All Guards, regardless of title, reported to Arnett, the "Chief," and had to contact Arnett when they reported to the worksites. (*Id.* ¶ 26.)

## B. Equipment

The Guards used their own equipment as well as equipment supplied by IDPS. Specifically, for example, at the 95th and Stony Island worksite IDPS supplied the Guards with push-to-talk phones, cell phones, a camera, and a Chevy SUV with an IDPS logo on the driver's door. (*Id.* ¶ 34.) IDPS carried automobile insurance for Guards driving its vehicles and reimbursed them for gas

expenses.  (*Id.* 35.)  Likewise, IDPS had liability insurance that covered the Guards for work done at the various worksites; Guards did not need to have their own liability insurance.  (*Id.* ¶ 36.)  IDPS required only that the Guards purchase their own uniform, firearm, bullets, and handcuffs.  (*Id.* ¶¶ 47, 48.)  For example, one Guard carried a Beretta pistol manufactured in Maryland and another carried a Taurus 65 handgun manufactured in Brazil.  (*Id.* ¶ 33.)  Also, each Guard had to wear an IDPS badge on his or her uniform.  (*Id.*)

IDPS ensured that the Guards were properly licensed to work as security guards.  IDPS did not require the Guards to have a private security contractor license and during the pay periods relevant to this lawsuit no Guard was licensed as a private security contractor.  (*Id.* ¶ 53.)  Rather, by registering with the Illinois Division of Professional Regulation and obtaining a permanent employee registration card, the Guards  were licensed generally as private security guards. (*Id.* ¶ 54.)

On behalf of the Guards, IDPS applied for and obtained Firearm Authorization Cards, or "tan cards," which allowed the Guards to carry firearms.  (*Id.* ¶ 55.)  Illinois issued the tan cards only to IDPS and the Guards could not use them for other security-related employment.  (*Id.* ¶ 57.)  Only individuals and organizations with private security contractor licenses, such as IDPS, were able to obtain tan cards.  (*Id.*)  So only through IDPS were the Guards able to obtain the tan cards.  (*Id.*)

As a private security contractor, IDPS had to maintain records for each Guard and certify that each Guard was fully updated on firearm training.  (*Id.* ¶ 58.) Arnett was responsible for hiring the Guards and organizing the paperwork for the licenses, while William make sure that the Guards were current on their firearm training.

## C.    Compensation and Discipline

IDPS created the work schedules and assigned the Guards to certain worksites.  (*Id.* ¶ 41.) The Guards had to complete weekly timesheets containing their daily and weekly hours, which were subject to Arnett's approval.  (*Id.* ¶ 42.)  The timesheets were turned in to the worksites and the Guards did not directly submit bills or invoices to IDPS.  (*Id.* ¶ 44.)  The Guards were paid every two weeks and their compensation was calculated simply by multiplying the hourly rate by the number of hours worked.  (*Id.* ¶¶ 43, 45.)  Accordingly, the Guards' skill or efficiency in completing the required duties was not linked to the amount they earned.  (*Id.*)

If the Guards worked over 40 hours in a week, IDPS did not pay them a premium for the overtime hours.  (*Id.* ¶ 46.)  They were paid for these extra hours according to their normal hourly rate. (*Id.*)

Arnett closely oversaw payroll integrity.  IDPS would not pay the Guards for a whole shift if Arnett believed that they were not on duty the entire time.  (*Id.* ¶ 61.)  For example, when Arnett visited a worksite on January 25, 2009 and the assigned guard had apparently abandoned his post, Arnett instructed payroll to only pay the guard for four hours of work, even though he had worked for 13 hours that day.  (*Id.*)  IDPS penalized this employee by taking six hours off his pay and subtracted an additional three hours for the time he was believed to be missing from the worksite. (*Id.*)  Similarly, IDPS disciplined another employee by taking out of her pay the amount of the automobile insurance deductible for an accident that occurred while she was driving an IDPS vehicle.  (*Id.* ¶ 62.)

The Guards were financially dependent upon IDPS for payment and were not in business for themselves.  (*Id.* ¶¶ 49, 51.)  In fact, accepting fees or compensation from other security agencies

without IDPS's permission could have resulted in termination.  (*Id.*)  Nor could the Guards solicit outside workers to carry out their security assignments for IDPS.  (*Id.* ¶ 50.)  Finally, Guards were barred from seeking their own clients, they did not have their own customers, and did not carry their own liability insurance.  (*Id.* ¶ 50.)

### D.     Department of Labor Investigation

In 2009, the Department of Labor investigated IDPS for compliance with the FLSA.  (*Id.* ¶ 63.)  IDPS produced documents requested by the Department regarding pay and hours worked.  (*Id.* ¶ 64.)  The pay records showed that IDPS paid the Guards at the regular rate for all hours worked, even overtime hours.  (*Id.*)  After interviewing the Guards about their employment with IDPS, the Department's investigator, Richard Pratt ("Pratt"), concluded that the Guards were employees of IDPS and entitled to the premium rate for overtime hours that FLSA requires.  (*Id.* ¶ 65.)  That is, Pratt found that by not paying the Guards time-and-a-half for overtime hours worked, IDPS had violated Section 7 of the FLSA.  (*Id.* ¶ 66.)

After this investigation, Pratt discussed his conclusions with William Lillard.  (*Id.* ¶ 67.)  Pratt specifically told William that the Guards were employees, not independent contractors, and he provided William with Wage and Hour publications outlining the record-keeping and pay requirements of the FLSA.  (*Id.*)  At that time William pledged future compliance with the FLSA.  (*Id.* ¶ 68.)  Apparently this was an empty promise, as IDPS continued after the investigation to pay its Guards at the regular rate for overtime hours, not the premium rate.  (*Id.* ¶ 69.)

Pratt used IDPS's payroll records to calculate the amount of overtime premium that IDPS owed to its Guards.  (*Id.* ¶ 70.)  In determining the total amount owed to the Guards, Pratt multiplied the number of overtime hours by half the regular pay rate.  (*Id.*)  Pratt used this method in

determining the amount of unpaid compensation owed to each Guard, and the total amount of unpaid overtime compensation amounted to $101,577.60.  (*Id.* ¶¶ 70, 71.)

Although Pratt was able to gather sufficient payroll records to make a reliable calculation of the unpaid overtime compensation,  IDPS discarded certain timesheets after payroll was generated from April 1, 2007 to December 28, 2008.  (*Id.* ¶¶ 72, 73.)

As a result of IDPS's FLSA violations, the Department requests injunctive relief and recovery of the unpaid compensation as well as liquidated damages, in the total amount of $203,155.20.  (*Id.* ¶ 74.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

## DISCUSSION

### I.    Scope of FLSA

The principal dispute between the Department and Defendants is whether IDPS falls within the FLSA and therefore had an obligation to pay a premium rate for overtime.  Defendants do not

dispute their failure to pay the Guards at a premium rate for overtime hours, nor do they question Pratt's calculation of damages.  In deciding whether the FLSA applies, the Court must determine whether IDPS is an "enterprise," whether William and Arnett individually are "employers," and whether the Guards are "employees" rather than independent contractors.  The interpretation of these employment definitions under the FLSA must be "broad and comprehensive in order to accomplish the remedial purposes of the Act."  *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987).

### A.     "Enterprise"

The FLSA defines "enterprise" as the "related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units."  29 U.S.C. § 203(r)(1).  A corporate defendant must follow the overtime compensation rules of 29 U.S.C. § 207 if it is an "enterprise engaged in commerce," which is: (1) an enterprise that "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person"; and (2) has annual gross volume of sales over $500,000.  *See* 29 U.S.C. § 203(s)(1)(A)(i), (ii).  Such a defendant is obligated to compensate employees who work over forty hours a week "at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).

First, IDPS meets the definition of an "enterprise."  IDPS is related because it is "but one company."  *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518 (1973).  Its hierarchical organization is similar to a police department, and Arnett, the "Chief," and William, the president

and owner, oversee all of the business operations. IDPS provides the Guards with vehicles, training, supplies, and tan cards to carry out their duties, and communicates IDPS's policies and procedures to the Guards. This is ample undisputed evidence to establish that IDPS is a unified operation under common control. Moreover, IDPS is a private security contractor that provides security services to businesses in the Chicago area, which is the common business purpose of the company. *See* 29 C.F.R. § 779.202; *Brennan*, 410 U.S. at 518 (fully integrated company directing its business operations at nine buildings from a central office met definition of "enterprise"). IDPS is thus an "enterprise" under the FLSA.

But classification as an "enterprise," by itself, does not mean that an entity is covered by the FLSA. The enterprise must also be "engaged in commerce." It is undisputed that IDPS had sales surpassing $500,000 in 2007 ($845,258), 2008 ($1,025,000), and 2009 ($976,747). (DoL ¶ 7.) The remaining question is whether IDPS "engaged" in commerce or had employees "handling" goods that moved across state lines. An enterprise need not actually be in the business of producing goods and transporting them over state lines to be "engaged in commerce"; employees handling out-of-state materials to fulfill job responsibilities can also be sufficient.[2] *See, e.g., Brock v. Hamad*, 867 F.2d 804, 808 (4th Cir. 1989) ("[L]ocal business activities fall within the FLSA when an enterprise employs workers who handle goods or materials that have moved or have been produced in interstate commerce."); *Marshall v. Brunner*, 668 F.2d 748, 751 (3d Cir. 1982) (garbage collection enterprise that used trucks, tires, batteries, oil, and gas from out-of-state was "engaged in commerce"); *Brennan*

---

[2] As additional support, the Senate Report on the amendments to the Fair Labor Standards Act of 1974 states: "The bill also adds the word 'or materials' after the word 'goods' to make clear the Congressional intent to include within this additional basis of coverage the *handling of goods consumed in the employer's business, as, e.g., the soap used by a laundry*." S. REP. NO. 93-690, at 7 (1974) (emphasis added).

*v. Dillion*, 483 F.2d 1334, 1336-37 (10th Cir. 1973) (use of paint, soap, and light bulbs manufactured out-of-state by apartment complex owners' employees fell under FLSA). Here, Guards handled firearms made outside of Illinois to perform their duties. (DoL ¶ 33.) IDPS also used vehicles, gas, cell phones, and push-to-talk phones in carrying out its business. Further, Defendants never challenged this point, either by presenting contrary evidence or attempting to discredit the Department's argument. Thus, IDPS had sufficient contacts with interstate commerce to bring it under the FLSA.

## B.     "Individual Employers"

The FLSA covers IDPS as an entity. But the question becomes whether William Lillard, president and owner of IDPS, and Arnett Lillard, chief operating officer of IDPS, are individually liable for FLSA violations.

Under the FLSA, an "employer" is defined broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203. The FLSA contemplates liability against not only the corporation owing the overtime compensation but also the individual corporate officers: "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *See, e.g., Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)). Courts in this district have also held that corporate officers with significant ownership interests, day-to-day control of operations, and involvement in the supervision and payment of employees can be personally liable for the corporation's failure to pay owed wages. *See, e.g., Morgan v. SpeakEasy, LLC*, 625 F. Supp. 2d 632, 646 (N.D. Ill. 2007) (Nolan, M.J.) (owner and

shareholder of corporation, who had "ultimate authority" in supervising, hiring, firing, and paying employees, was jointly and severally liable); *Harper v. Wilson*, 302 F. Supp. 2d 873, 883 (N.D. Ill. 2004) (Denlow, M.J.) (corporate officers with obligation to pay plaintiff his earned wages were personally liable); *Herman v. Harmelech*, No. 93 C 3458, 2000 WL 420839, at *8 (N.D. Ill. April 14, 2000) (Gottschall, J.) (individual liability where evidence established that officer "had knowledge and authority to act on employees' complaints about NSF checks, and to decide which employees would get paid. [The individual officer] need not have been intimately involved with administering the payroll system in order to be personally liable for failing to pay employees."); *Digiore v. State of Ill.*, 962 F. Supp. 1064, 1079 (N.D. Ill. 1997) (Castillo, J.) (citing *Elliott Travel* and interpreting § 203(d) to make no distinction between individuals and institutions); *McLaughlin v. Lunde Truck Sales, Inc.*, 714 F. Supp. 920, 922-23 (N.D. Ill. 1989) (Roszkowski, J.) (president acting in direct and indirect interest of corporate defendants is an "employer" under FLSA).

Here, the leadership positions of William and Arnett Lillard, coupled with their extensive daily oversight of IDPS's operations align this case with others that have found individual liability. And the undisputed facts support such a finding. William Lillard was the president and sole owner of IDPS and was responsible for payroll, accounting, and invoicing. (DoL ¶ 8.) He also signed the paychecks and controlled all of IPS's corporate activities. (*Id.* ¶ 9.) Arnett Lillard assisted William with maintaining the time records and was the chief operating officer. (*Id.* ¶¶ 8, 10.) Arnett supervised the Guards on a daily basis, which included dividing up work assignments and overseeing scheduling, hiring, firing, and compensation. (*Id.* ¶ 11.) William and Arnett Lillard not only had operational control over all of IDPS's business activities but also were directly involved in IDPS's

pay and employment practices. Both are therefore "employers" under § 203(d) and are individually liable for any unpaid overtime compensation.

C.    **"Employees"**

Only employer-employee relationships fall under the FLSA. *See* 29 U.S.C. § 207. An "employee" is defined as "any individual employed by an employer," *id.* § 203(e)(1), and "employ" means to "suffer or permit to work," *id.* § 203(g). Defendants maintain that the Guards were independent contractors, not employees, and therefore outside the FLSA.

The economic realities test separates employees, who are subject to the FLSA's protections, from independent contractors, who are not. *See Lauritzen*, 835 F.2d at 1534. This test elucidates whether employees are actually "dependent upon the business to which they render service." *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947). By looking at six factors, neither of which by itself is determinative of the employment relationship, the Court can ascertain the economic reality of the employment arrangement. *Lauritzen*, 835 F.2d at 1534. The factors, known as the *Silk* factors, include: (1) the degree and nature of control that the employer has over the manner in which the alleged employee performs the work; (2) the chance that the alleged employee has for profit or loss depending on his or her skill; (3) the alleged employee's own investment in the equipment or materials needed to complete the work; (4) whether the service at issue requires special skill; (5) whether the employment relationship is permanent; and (6) the extent to which the alleged employee's service is an "integral part" of the employer's business. *Id.* at 1534-35; *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 565-66 (7th Cir. 2009); *U.S. v. Silk*, 331 U.S. 704 (1947).

Like this case, *Schultz v. Capital Int'l Security, Inc.*, 466 F.3d 298 (4th Cir. 2006), involved the application of the *Silk* factors to the relationship between security guards and their employer. In reversing the district court, the Fourth Circuit found that the security guards were "FLSA-covered employees, not independent contractors." *Id.* at 307. The employer had control over the security guards because it created and distributed a detailed memorandum explaining precisely how the guards were to perform their job. *Id.* Because the guards were also paid at a "set rate" rather than according to each task they completed, there was no opportunity for them to increase their pay based on skill or efficiency. *Id.* at 308. Moreover, the guards had the option to use their own firearm, but the employer supplied equipment such as radios, cell phones, cars, first aid kits, and firearms to those who wanted them. *Id.* The guards also operated under the employer's license and liability insurance. *Id.* Finally, the guards had a permanent employment relationship with the employer and were an "integral part" of the employer's security services business. Taken together, the court concluded that the guards were "not [independent contractors] in business for themselves," but rather employees entitled to the protection of the FLSA.

### 1. Control

If the employer oversees the "manner and method" of how the alleged employees are to perform their work, they are probably employees rather than independent contractors. *See, e.g., Harper*, 302 F. Supp. 2d at 878 (quoting *Carrell v. Sunland Constr.*, 998 F.2d 330, 332 (5th Cir. 1993)). For example, a broadcasting company "controlled" radio announcers because it dominated the manner in which the announcers performed their job: (1) it set rules about when news broadcasts would occur and how long they would be; (2) it exclusively controlled the marketing devices, such as contests; (3) it oversaw commercials and station identifications; and (4) it determined even when

14

announcers could announce the time. *U.S. E.E.O.C. v. Century Broad. Corp.*, No. 89 C 5842, 1990 WL 43286, at *3 (N.D. Ill. March 23, 1990) (Conlon, J.).

Here, IDPS dominated how the Guards were to provide security services to clients. It provided them with operating procedures to follow in completing their tasks. (DoL ¶ 27.) For example, at the 95th and Stony site, the Guards received a five-page "Policies and Procedures" handout that Arnett and Commander Rone jointly enforced. (*Id.* ¶ 38.) All of the Guards received another memorandum, dated March 3, 2008, that instructed them on the following details: (1) who to notify before the Chicago Fire and Police Departments in the event of an emergency; (2) the order of patrols, that is, the order to check fire extinguishers, exit lightings, safety violations, and overnight parking; (3) what to include in their written reports; and (4) how to properly check their equipment. (*Id.* ¶ 29.) Not only did IDPS instruct the Guards on exactly how they should perform their jobs, but it also closely monitored their compliance with IDPS's procedures. IDPS held frequent meetings with the Guards to remind them about the order of patrols, uniform code, and equipment checks. (*Id.* ¶ 28.) Arnett visited client worksites to verify that the Guards were adequately complying with the procedures and the Guards were required to submit incident reports to IDPS detailing events that occurred during the shift. (*Id.* ¶¶ 28, 39.)

These undisputed facts show that the Guards did not independently determine the manner and method of performing their jobs. Just like *Century Broad. Corp.*, the circulated memorandum and IDPS policies set forth with specificity the manner in which the Guards were to complete their work. IDPS controlled the tasks that the Guards had to complete during their shifts, the order that these tasks should be completed, and how the Guards were supposed to react to suspicious activity. IDPS

also reviewed the Guards' written reports to make certain they were executing their responsibilities in accordance with IDPS's policies.

Defendants provide no Rule 56.1 facts undermining IDPS's control over the Guards. Rather, Defendants argue in their brief that IDPS's clients, not IDPS itself, controlled how the Guards performed their work. But Defendants made no Rule 56.1 filing either disputing the Department's facts or offering additional facts to support such an argument. This deficiency is fatal to Defendants' argument, which the Court disregards. And even assuming the Court determined that there were credible facts suggesting that the preferences of IDPS's clients set the manner in which the Guards provided security, it is undisputed that IDPS was the direct liaison between clients and the Guards. The Guards did not report to the clients, nor did they receive standardized procedures from clients elucidating how to carry out their duties. In other words, IDPS directly monitored the Guards to ensure that they met the needs of a particular client and in this way IDPS exclusively held power over the Guards. As such, the "control" factor supports classifying the Guards as employees.

### 2. Opportunity for Profit or Loss

Like *Schultz*, the Guards were paid by the hour. (DoL ¶ 43.) ("Guards' compensation is strictly determined by their hourly rate and number of hours worked.") They had no opportunity, by performing their tasks efficiently and skillfully, to earn additional profit, nor did they have a share in IDPS's overall profits or losses. Simply put, the Guards' performance had no correlation to the amount they earned. *See, e.g., Harper*, 302 F. Supp. 2d at 879. This is another indication that the Guards were IDPS employees.

### 3. Investment in Equipment

IDPS provided vehicles, gas, car insurance, and cell phones for the Guards but they were responsible for supplying their own firearm, bullets, handcuffs, and uniform. (DoL ¶¶ 34, 35.) While the Guards supplied some of their own equipment, this factor supports classification as employees because they worked under IDPS's security contractor license and relied on IDPS to supply liability insurance. *See Schultz*, 466 F.3d at 308 (security guards never obtained individual licenses and insurance and continued to operate under employer's license and liability insurance).

Under Illinois law, independent contractors providing security services must have a valid license. *See* 225 ILCS 447/10-5(a). A "private security contractor" is a "person engaged in the business of providing a private security officer, watchman, patrol, guard dog, canine odor detection . . . on a contractual basis for another person, firm, corporation, or other entity." *Id.* § 447/5-10. There are numerous requirements that the applicant must satisfy to obtain this license, such as having general liability insurance. *Id.* § 447/25-10(b). None of the Guards in this case ever held a license to operate as a private security contractor. (DoL ¶ 53.)

Instead, the Guards were licensed generally as private security guards. (*Id.* ¶ 54.) As employees of IDPS, a licensed private security contractor, they had to register with the Division of Professional Regulation and obtain a permanent employee registration card. *See* 225 ILCS 447/35-30. The Guards also had to obtain a firearm authorization card, or "tan card," allowing them to carry a firearm on the job. *Id.* § 447/35-35. Illinois provides a tan card, however, only when the Guards pass firearm training and issues the card only to licensed security agencies on behalf of its security guards. *Id.* Here, the Guards could not apply for the tan cards on their own; IDPS applied for the

cards, which Illinois issued to IDPS, so the Guards could not use them for other security-related employment.  (DoL ¶ 57.)

IDPS made the kind of substantial investment that an employer would make for employees, not independent contractors.  IDPS provided the majority of equipment that the Guards needed to carry out their tasks, namely vehicles, gas, car insurance, and cell phones.  The Guards had to obtain their own firearms, bullets, handcuffs, and uniforms but would have been unable to carry the firearms without IDPS's intervention.  Moreover, the undisputed facts show that the Guards were not certified to operate as independent contractors.  The general private security guard license that the Guards had only allowed them to perform security services for IDPS or another licensed private security contractor agency; they did not have authorization to perform these services independently.  Similar to *Schultz*, the Guards here never acquired their own private security business license, that is, the license to operate as private security contractors, nor their own liability insurance.  466 F.3d at 308.

### 4.      Special Skills

Although certain skills, such as operating a firearm, were required to perform the job, on the whole the Guards' work did not demand a high degree of technical expertise or skill.  And even though the Guards were familiar with using a firearm, they were not expected to use it; in fact, instead of reacting themselves to suspected criminal activity IDPS expected them to call 911.  (DoL ¶ 30.)

The Guards were primarily responsible for the following: walking or driving around worksites to detect unauthorized activity; checking overnight parking and safety equipment such as fire extinguishers; completing reports detailing any incidences during the shift; and following closely

IDPS's procedures for providing security services. These tasks comprised the vast majority of the Guards' work and they did not require any special skills. *See, e.g., Schultz*, 466 F.3d at 308 (security guards with specialized training in personal protection were not simply the "average security guard" and providing security for a diplomat entailed certain challenges, but this factor was a equally offset by the guards' responsibility for arranging wake up calls, moving furniture, and providing the newspaper); *Lauritzen*, 835 F.2d at 1537 (although "development of occupational skills" is needed to harvest pickles these skills are "no different from what any good employee in any line of work must do"; thus, this level of skill did not differentiate pickle harvesters from harvesters of other crops). Here, the Guards had to acquire a certain amount of general knowledge about executing IDPS's procedures, but monitoring client worksites involved normal, unspecialized security guard work.

### 5. Permanency

"The more permanent the [employment] relationship, the more likely the worker is to be an employee." *Schultz*, 466 F.3d at 309. The undisputed facts before the Court indicate that IDPS and the Guards contemplated a long-term relationship. IDPS has provided security services to some of its clients for many years. (DoL ¶ 24.) The internal organization of IDPS also evidences an intent to have the Guards remain permanent employees. The hierarchical system of titles similar to a police department (officers, sergeants, lieutenants, commanders, captain, and chief) gave the Guards incentive to remain with IDPS for an extended period of time so they can advance within the company. (DoL ¶ 25.)

The employment contract between the Guards and IDPS was titled "Independent Contractor Contracts." It contained no specific terms as to the length of employment and created an at-will

employment relationship. The employer's label of "independent contractor" carries little weight in defining the Guards' status as independent contractors; after all, the purpose of the economic realities test is to set aside such conclusory classifications and evaluate the totality of circumstances bearing on the working relationship. *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) (status as an employee under FLSA depends on the "economic reality" of the employment relationship, rather than any "technical label"); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947); *see, e.g., Brock v. Mr. M. Fireworks, Inc.*, 814 F.2d 1042, 1044 (5th Cir. 1987) ("[F]acile labels and subjective factors are only relevant to the extent that they mirror 'economic reality.'"). Without any factual support that the Guards operated on their own as independent contractors the employment contract with the "independent contractor" label is unpersuasive.

The only facts before the Court support a permanent employment relationship between the Guards and IDPS. In fact, IDPS does not dispute any of these facts or offer any of its own showing a more temporary arrangement.

### 6. Integral Part of Business

IDPS is an Illinois corporation that provides private security services, which includes monitoring worksites for criminal activity and protecting the client's property. (*Id.* ¶ 5.) There can be little doubt that the Guards, who were at the clients' worksites actually performing the services that IDPS offers, were an integral part of the business. *See, e.g., Lauritzen*, 835 F.2d at 1538-39 (migrant pickle harvesters integral to business because they were an essential link in the eventual sale of the pickles); *Schultz,* 466 F.3d at 309 (security guards working for a security company formed for purpose of providing security services were integral part of the business); *Harper*, 302 F. Supp. 2d

at 879-80 (Field Supervisor who oversaw security guards for a company that "provid[ed security guards" was integral to business).

All of the *Silk* factors show that the Guards were "employees," not independent contractors, of IDPS. The Guards were not in business for themselves but rather worked on IDPS's behalf and in accordance with IDPS's rules to provide security services. As "employees" of IDPS, the Guards therefore fall under the FLSA.

## II. Overtime Under FLSA

Because the FLSA applies, IDPS and William and Arnett Lillard, as "employers," had an obligation to pay the Guards, its "employees," at a ""rate not less than one and one-half times the regular rate" for any hours worked in excess of forty hours in a workweek. *See* 29 U.S.C. § 207(a). It is undisputed that IDPS failed to pay the Guards a premium rate for overtime hours worked. (DoL ¶ 46.) In fact, the Defendants submitted no Local Rule 56.1 facts to controvert this fact, nor do they argue in their response brief that they compensated the Guards at a higher rate for overtime hours. Even though the economic realities test cannot support such a classification, Defendants attempted to characterize the Guards as independent contractors by having them sign an employment contract titled "Independent Contractor Contract." Such an effort to avoid responsibility under FLSA to pay the overtime premium is ineffective. Defendants violated the FLSA and therefore are liable for unpaid overtime compensation.

Turning to the amount of damages, the Court adopts Investigator Pratt's calculation of unpaid overtime. In determining the total amount owed to the Guards, Pratt multiplied the number of overtime hours by half the regular pay rate, which came to $101,577.60. (DoL ¶ 70.) The Court has no reason to doubt the accuracy of Pratt's calculations, which he based upon IDPS's payroll records

for the relevant time period. (R. 26, Ex. I.) Nor does IDPS dispute either the methodology used or the total amount reached. So the damages amount is not only supported by reliable evidence obtained through discovery but is also deemed admitted by IDPS's failure to present contrary facts.

The Department also seeks liquidated damages of $101,577.60, the amount of back wages due. Under FLSA, an employer who violates the overtime compensation provision is liable to the employee in the amount of the unpaid compensation as well as "in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). In effect, liquidated damages are "mandatory [for FLSA violations] unless the district court finds that the defendant-employer was acting in good faith and reasonably believed that its conduct was consistent with the law." *Shea v. Galaxie Lumber & Constr. Co., Ltd.*, 152 F.3d 729, 733 (7th Cir. 1998). So a "substantial burden" is on the employer to overcome the "strong presumption under the statute in favor of doubling [the damage award]." *Id.*; *Bankston v. State of Ill.*, 60 F.3d 1249, 1254 (7th Cir. 1995). Awarding liquidated damages and "doubling" the amount of damages is the "norm, not the exception." *Shea*, 152 F.3d at 733.

Defendants cannot overcome such a presumption. The undisputed facts establish that IDPS was subject to FLSA's overtime payment rules and violated these rules by failing to pay the Guards at a premium rate for overtime hours worked. Defendants present no legal argument or facts that the good faith exception applies here to overcome the presumption of liquidated damages. In fact, Defendants never even mention liquidated damages in their brief. The Court therefore also awards liquidated damages in the amount of $101,577.60.

In total, Defendants are liable for damages of $203,155.20 for violating FLSA's overtime premium requirement.

### III.  Maintaining Pay Records

The Department maintains that IDPS also violated the FLSA's record-keeping provisions, which require employers to keep accurate and updated time records of payment information.  *See* 29 U.S.C. § 211.  Here, there is evidence that IDPS failed to comply with this rule by not preserving its time records from April 1, 2007 to December 27, 2008.  (DoL ¶¶ 72, 73.)  Nevertheless, Investigator Pratt was able to gather payroll records covering the relevant period to determine the number of hours each Guard worked per week.  These records were sufficient to calculate the unpaid overtime premium.

In the end, Pratt was able to accurately and completely ascertain the overtime hours worked by each Guard based on records IDPS did have in its possession.  This consideration, along with the fact that Defendants never challenged the accuracy of the unpaid overtime premium amount, renders the issue of IDPS's compliance with § 211's record-keeping requirement moot.  The Department has properly established the amount of unpaid wages.

### IV.  Injunction

Despite being on notice of its violations from this lawsuit and the prior investigation, the Department claims that Defendants continued to dodge their obligation under the FLSA to pay the overtime premium.  The Department seeks an injunction to ensure Defendants' future compliance with the FLSA.

This Court has jurisdiction to "restrain [FLSA] violations".  *See* 29 U.S.C. § 217.  Where, as here, the Department has established violations of the statute and there are insufficient assurances that Defendants will comply with the FLSA in the future, an injunction is appropriate.  *See, e.g., Herman v. Brewah Cab, Inc.*, 992 F. Supp. 1054, 1060 (E.D. Wis. 1998); *Brock v. Lauritzen*, 649

F. Supp. 16, 18 (E.D. Wis. 1986), *aff'd*, 835 F.2d 1529 (7th Cir. 1987). Although the Court can consider current compliance as an indication of a willingness to follow FLSA, such evidence by itself is not enough. *See, e.g., Herman*, 992 F. Supp. at 1061 (granting injunction to restrain future FLSA violations even though defendant was currently in compliance with FLSA).

Here, the Court has no confidence that IDPS will comply with the FLSA going forward. Despite explicit warnings from Investigator Pratt, IDPS continued to improperly withhold from the Guards overtime premium payments. And even in *Herman*, where the defendant was in compliance with the FLSA during the lawsuit, an injunction was still an appropriate remedy. Here, there is no evidence that Defendants are currently abiding by the FLSA and Defendants offer no mitigating facts demonstrating their commitment to following the FLSA. That is, Defendants present no Rule 56.1 facts or legal argument showing any indication that there is a reasonable likelihood that they will comply with the FLSA. This is the type of scenario where an injunction is appropriate, so the Court also enjoins IDPS from violating 29 U.S.C. § 207(a)(1).

## CONCLUSION AND ORDER

For these reasons, the Court grants the Department's Motion for Summary Judgment in the amount of $203,155.20. The Court also enjoins IDPS from violating the overtime premium requirement of 29 U.S.C. § 207(a)(1) in the future.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: May 24, 2011

24